employees, agents, and contractors, and all tenants and other occupants from causing or permitting any Prohibited Activities or Conditions.  Borrower shall not lease or allow the sublease or use of all or any portion of the Mortgaged Property to any tenant or subtenant for nonresidential use by any user that, in the ordinary course of its business, would cause or permit any Prohibited Activity or Condition.

(d)      If an O&M Program has been established with respect to Hazardous Materials, Borrower shall comply in a timely manner with, and cause all employees, agents, and contractors of Borrower and any other persons present on the Mortgaged Property to comply with the O&M Program.  All costs of performance of Borrower's obligations under any O&M Program shall be paid by Borrower, and Lender's out-of-pocket costs incurred in connection with the monitoring and review of the O&M Program and Borrower's performance shall be paid by Borrower upon demand by Lender.  Any such out-of-pocket costs of Lender which Borrower fails to pay promptly shall become an additional part of the Indebtedness as provided in Section 12.

(e)      Borrower represents and warrants to Lender that, except as previously disclosed by Borrower to Lender in writing:

(1)      Borrower has not at any time engaged in, caused or permitted any Prohibited Activities or Conditions;

(2)      to the best of Borrower's knowledge after reasonable and diligent inquiry, no Prohibited Activities or Conditions exist or have existed;

(3)      except to the extent previously disclosed by Borrower to Lender in writing, the Mortgaged Property does not now contain any underground storage tanks, and, to the best of Borrower's knowledge after reasonable and diligent inquiry, the Mortgaged Property has not contained any underground storage tanks in the past.  If there is an underground storage tank located on the Property which has been previously disclosed by Borrower to Lender in writing, that tank complies with all requirements of Hazardous Materials Laws;

(4)      Borrower has complied with all Hazardous Materials Laws, including all requirements for notification regarding releases of Hazardous Materials.  Without limiting the generality of the foregoing, Borrower has obtained all Environmental Permits required for the operation of the Mortgaged Property in accordance with Hazardous Materials Laws now in effect and all such Environmental Permits are in full force and effect;

(5)      no event has occurred with respect to the Mortgaged Property that constitutes, or with the passing of time or the giving of notice would constitute, noncompliance with the terms of any Environmental Permit;

(6)    there are no actions, suits, claims or proceedings pending or, to the best of Borrower's knowledge after reasonable and diligent inquiry, threatened that involve the Mortgaged Property and allege, arise out of, or relate to any Prohibited Activity or Condition; and

(7)    Borrower has not received any complaint, order, notice of violation or other communication from any Governmental Authority with regard to air emissions, water discharges, noise emissions or Hazardous Materials, or any other environmental, health or safety matters affecting the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property.

The representations and warranties in this Section 18 shall be continuing representations and warranties that shall be deemed to be made by Borrower throughout the term of the loan evidenced by the Note, until the Indebtedness has been paid in full.

(f)    Borrower shall promptly notify Lender in writing upon the occurrence of any of the following events:

(1)    Borrower's discovery of any Prohibited Activity or Condition;

(2)    Borrower's receipt of or knowledge of any complaint, order, notice of violation or other communication from any Governmental Authority or other person with regard to present or future alleged Prohibited Activities or Conditions or any other environmental, health or safety matters affecting the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property; and

(3)    any representation or warranty in this Section 18 becomes untrue after the date of this Agreement.

Any such notice given by Borrower shall not relieve Borrower of, or result in a waiver of, any obligation under this Instrument, the Note, or any other Loan Document.

(g)    Borrower shall pay promptly the costs of any environmental inspections, tests or audits ("**Environmental Inspections**") required by Lender in connection with any foreclosure or deed in lieu of foreclosure, or as a condition of Lender's consent to any Transfer under Section 21, or required by Lender following a reasonable determination by Lender that Prohibited Activities or Conditions may exist. Any such costs incurred by Lender (including the fees and out-of-pocket costs of attorneys and technical consultants whether incurred in connection with any judicial or administrative process or otherwise) which Borrower fails to pay promptly shall become an additional part of the Indebtedness as provided in Section 12. The results of all Environmental Inspections made by Lender shall at all times remain the property of Lender and Lender shall have no obligation to disclose or otherwise make available to Borrower or any other party such results or any other information obtained by Lender in connection with its Environmental Inspections. Lender

hereby reserves the right, and Borrower hereby expressly authorizes Lender, to make available to any party, including any prospective bidder at a foreclosure sale of the Mortgaged Property, the results of any Environmental Inspections made by Lender with respect to the Mortgaged Property. Borrower consents to Lender notifying any party (either as part of a notice of sale or otherwise) of the results of any of Lender's Environmental Inspections. Borrower acknowledges that Lender cannot control or otherwise assure the truthfulness or accuracy of the results of any of its Environmental Inspections and that the release of such results to prospective bidders at a foreclosure sale of the Mortgaged Property may have a material and adverse effect upon the amount which a party may bid at such sale. Borrower agrees that Lender shall have no liability whatsoever as a result of delivering the results of any of its Environmental Inspections to any third party, and Borrower hereby releases and forever discharges Lender from any and all claims, damages, or causes of action, arising out of, connected with or incidental to the results of, the delivery of any of Lender's Environmental Inspections.

(h)    If any investigation, site monitoring, containment, clean-up, restoration or other remedial work ("**Remedial Work**") is necessary to comply with any Hazardous Materials Law or order of any Governmental Authority that has or acquires jurisdiction over the Mortgaged Property or the use, operation or improvement of the Mortgaged Property under any Hazardous Materials Law, Borrower shall, by the earlier of (1) the applicable deadline required by Hazardous Materials Law or (2) 30 days after notice from Lender demanding such action, begin performing the Remedial Work, and thereafter diligently prosecute it to completion, and shall in any event complete the work by the time required by applicable Hazardous Materials Law. If Borrower fails to begin on a timely basis or diligently prosecute any required Remedial Work, Lender may, at its option, cause the Remedial Work to be completed, in which case Borrower shall reimburse Lender on demand for the cost of doing so. Any reimbursement due from Borrower to Lender shall become part of the Indebtedness as provided in Section 12.

(i)    Borrower shall cooperate with any inquiry by any Governmental Authority and shall comply with any governmental or judicial order which arises from any alleged Prohibited Activity or Condition.

(j)    Borrower shall indemnify, hold harmless and defend (i) Lender, (ii) any prior owner or holder of the Note, (iii) the Loan Servicer, (iv) any prior Loan Servicer, (v) the officers, directors, shareholders, partners, employees and trustees of any of the foregoing, and (vi) the heirs, legal representatives, successors and assigns of each of the foregoing (collectively, the "**Indemnitees**") from and against all proceedings, claims, damages, penalties and costs (whether initiated or sought by Governmental Authorities or private parties), including fees and out-of-pocket expenses of attorneys and expert witnesses, investigatory fees, and remediation costs, whether incurred in connection with any judicial or administrative process or otherwise, arising directly or indirectly from any of the following:

(1)    any breach of any representation or warranty of Borrower in this Section 18;
(2)    any failure by Borrower to perform any of its obligations under this Section 18;

(3)     the existence or alleged existence of any Prohibited Activity or Condition;

(4)     the presence or alleged presence of Hazardous Materials on or under the Mortgaged Property or any property of Borrower that is adjacent to the Mortgaged Property except for such Hazardous Materials as Lender has specifically caused to be transported onto the Mortgaged Property; and

(5)     the actual or alleged violation of any Hazardous Materials Law.

(k)     Counsel selected by Borrower to defend Indemnitees shall be subject to the approval of those Indemnitees.  However, any Indemnitee may elect to defend any claim or legal or administrative proceeding at the Borrower's expense.

(l)     Borrower shall not, without the prior written consent of those Indemnitees who are named as parties to a claim or legal or administrative proceeding (a **"Claim"**), settle or compromise the Claim if the settlement (1) results in the entry of any judgment that does not include as an unconditional term the delivery by the claimant or plaintiff to Lender of a written release of those Indemnitees, satisfactory in form and substance to Lender; or (2) may materially and adversely affect Lender, as determined by Lender in its discretion.

(m)     Lender agrees that the indemnity under this Section 18 shall be limited to the assets of Borrower and Lender shall not seek to recover any deficiency from any natural persons who are general partners of Borrower.

(n)     Borrower shall, at its own cost and expense, do all of the following:

(1)     pay or satisfy any judgment or decree that may be entered against any Indemnitee or Indemnitees in any legal or administrative proceeding incident to any matters against which Indemnitees are entitled to be indemnified under this Section 18;

(2)     reimburse Indemnitees for any expenses paid or incurred in connection with any matters against which Indemnitees are entitled to be indemnified under this Section 18; and

(3)     reimburse Indemnitees for any and all expenses, including fees and out-of-pocket expenses of attorneys and expert witnesses, paid or incurred in connection with the enforcement by Indemnitees of their rights under this Section 18, or in monitoring and participating in any legal or administrative proceeding.

(o)     In any circumstances in which the indemnity under this Section 18 applies, Lender may employ its own legal counsel and consultants to prosecute, defend or negotiate any claim or legal or administrative proceeding and Lender, with the prior written consent of Borrower (which shall not be unreasonably withheld, delayed or conditioned), may settle or compromise any action or legal or administrative proceeding.  Borrower shall reimburse Lender upon demand for all costs and

expenses incurred by Lender, including all costs of settlements entered into in good faith, and the fees and out-of-pocket expenses of such attorneys and consultants.

(p)     The provisions of this Section 18 shall be in addition to any and all other obligations and liabilities that Borrower may have under applicable law or under other Loan Documents, and each Indemnitee shall be entitled to indemnification under this Section 18 without regard to whether Lender or that Indemnitee has exercised any rights against the Mortgaged Property or any other security, pursued any rights against any guarantor, or pursued any other rights available under the Loan Documents or applicable law. If Borrower consists of more than one person or entity, the obligation of those persons or entities to indemnify the Indemnitees under this Section 18 shall be joint and several. The obligation of Borrower to indemnify the Indemnitees under this Section 18 shall survive any repayment or discharge of the Indebtedness, any foreclosure proceeding, any foreclosure sale, any delivery of any deed in lieu of foreclosure, and any release of record of the lien of this Instrument.

## 19.   PROPERTY AND LIABILITY INSURANCE.

(a)     Borrower shall keep the Improvements insured at all times against such hazards as Lender may from time to time require, which insurance shall include but not be limited to coverage against loss by fire and allied perils, general boiler and machinery coverage, and business income coverage.  Lender's insurance requirements may change from time to time throughout the term of the Indebtedness.  If Lender so requires, such insurance shall also include sinkhole insurance, mine subsidence insurance, earthquake insurance, and, if the Mortgaged Property does not conform to applicable zoning or land use laws, building ordinance or law coverage.  If any of the Improvements is located in an area identified by the Federal Emergency Management Agency (or any successor to that agency) as an area having special flood hazards, and if flood insurance is available in that area, Borrower shall insure such Improvements against loss by flood.

(b)     All premiums on insurance policies required under Section 19(a) shall be paid in the manner provided in Section 7, unless Lender has designated in writing another method of payment. All such policies shall also be in a form approved by Lender.  All policies of property damage insurance shall include a non-contributing, non-reporting mortgage clause in favor of, and in a form approved by, Lender.  Lender shall have the right to hold the original policies or duplicate original policies of all insurance required by Section 19(a).  Borrower shall promptly deliver to Lender a copy of all renewal and other notices received by Borrower with respect to the policies and all receipts for paid premiums.  At least 30 days prior to the expiration date of a policy, Borrower shall deliver to Lender the original  (or a duplicate original) of a renewal policy in form satisfactory to Lender.

(c)     Borrower shall maintain at all times commercial general liability insurance, workers' compensation insurance and such other liability, errors and omissions and fidelity insurance coverages as Lender may from time to time require.

(d)    All insurance policies and renewals of insurance policies required by this Section 19 shall be in such amounts and for such periods as Lender may from time to time require, and shall be issued by insurance companies satisfactory to Lender.

(e)    Borrower shall comply with all insurance requirements and shall not permit any condition to exist on the Mortgaged Property that would invalidate any part of any insurance coverage that this Instrument requires Borrower to maintain.

(f)    In the event of loss, Borrower shall give immediate written notice to the insurance carrier and to Lender.  Borrower hereby authorizes and appoints Lender as attorney-in-fact for Borrower to make proof of loss, to adjust and compromise any claims under policies of property damage insurance, to appear in and prosecute any action arising from such property damage insurance policies, to collect and receive the proceeds of property damage insurance, and to deduct from such proceeds Lender's expenses incurred in the collection of such proceeds.  This power of attorney is coupled with an interest and therefore is irrevocable.  However, nothing contained in this Section 19 shall require Lender to incur any expense or take any action.  Lender may, at Lender's option, (1) hold the balance of such proceeds to be used to reimburse Borrower for the cost of restoring and repairing the Mortgaged Property to the equivalent of its original condition or to a condition approved by Lender (the "Restoration"), or (2) apply the balance of such proceeds to the payment of the Indebtedness, whether or not then due. To the extent Lender determines to apply insurance proceeds to Restoration, Lender shall do so in accordance with Lender's then-current policies relating to the restoration of casualty damage on similar multifamily properties.

(g)    Lender shall not exercise its option to apply insurance proceeds to the payment of the Indebtedness if all of the following conditions are met:  (1) no Event of Default (or any event which, with the giving of notice or the passage of time, or both, would constitute an Event of Default) has occurred and is continuing; (2) Lender determines, in its discretion, that there will be sufficient funds to complete the Restoration; (3) Lender determines, in its discretion, that the rental income from the Mortgaged Property after completion of the Restoration will be sufficient to meet all operating costs and other expenses, Imposition Deposits, deposits to reserves and loan repayment obligations relating to the Mortgaged Property; (4) Lender determines, in its discretion, that the Restoration will be completed before the earlier of (A) one year before the maturity date of the Note or (B) one year after the date of the loss or casualty; and (5) upon Lender's request, Borrower provides Lender evidence of the availability during and after the Restoration of the insurance required to be maintained by Borrower pursuant to this Section 19.

(h)    If the Mortgaged Property is sold at a foreclosure sale or Lender acquires title to the Mortgaged Property, Lender shall automatically succeed to all rights of Borrower in and to any insurance policies and unearned insurance premiums and in and to the proceeds resulting from any damage to the Mortgaged Property prior to such sale or acquisition.

20.    **CONDEMNATION.**

(a)    Borrower shall promptly notify Lender of any action or proceeding relating to any condemnation or other taking, or conveyance in lieu thereof, of all or any part of the Mortgaged

Property, whether direct or indirect (a **"Condemnation"**). Borrower shall appear in and prosecute or defend any action or proceeding relating to any Condemnation unless otherwise directed by Lender in writing. Borrower authorizes and appoints Lender as attorney-in-fact for Borrower to commence, appear in and prosecute, in Lender's or Borrower's name, any action or proceeding relating to any Condemnation and to settle or compromise any claim in connection with any Condemnation. This power of attorney is coupled with an interest and therefore is irrevocable. However, nothing contained in this Section 20 shall require Lender to incur any expense or take any action. Borrower hereby transfers and assigns to Lender all right, title and interest of Borrower in and to any award or payment with respect to (i) any Condemnation, or any conveyance in lieu of Condemnation, and (ii) any damage to the Mortgaged Property caused by governmental action that does not result in a Condemnation.

(b) Lender may apply such awards or proceeds, after the deduction of Lender's expenses incurred in the collection of such amounts, at Lender's option, to the restoration or repair of the Mortgaged Property or to the payment of the Indebtedness, with the balance, if any, to Borrower. Unless Lender otherwise agrees in writing, any application of any awards or proceeds to the Indebtedness shall not extend or postpone the due date of any monthly installments referred to in the Note, Section 7 of this Instrument or any Collateral Agreement, or change the amount of such installments. Borrower agrees to execute such further evidence of assignment of any awards or proceeds as Lender may require.

**21.    INTENTIONALLY OMITTED.**

**22.    EVENTS OF DEFAULT.**  The occurrence of any one or more of the following shall constitute an Event of Default under this Instrument:

(a) any failure by Borrower to pay or deposit when due any amount required by the Note, this Instrument or any other Loan Document;

(b) any failure by Borrower to maintain the insurance coverage required by Section 19;

(c) any failure by Borrower to comply with the provisions of Section 33;

(d) fraud or material misrepresentation or material omission by Borrower, or any of its officers, directors, trustees, general partners or managers, Key Principal or any guarantor in connection with (A) the application for or creation of the Indebtedness, (B) any financial statement, rent roll, or other report or information provided to Lender during the term of the Indebtedness, or (C) any request for Lender's consent to any proposed action, including a request for disbursement of funds under any Collateral Agreement;

(e) any Event of Default under any provision set forth in Schedule B;

(f) the commencement of a forfeiture action or proceeding, whether civil or criminal, which, in Lender's reasonable judgment, could result in a forfeiture of the Mortgaged Property or

otherwise materially impair the lien created by this Instrument or Lender's interest in the Mortgaged Property;

(g)    any failure by Borrower to perform any of its obligations under this Instrument (other than those specified in Sections 22(a) through (f)), as and when required, which continues for a period of 30 days after notice of such failure by Lender to Borrower, but no such notice or grace period shall apply in the case of any such failure which could, in Lender's judgment, absent immediate exercise by Lender of a right or remedy under this Instrument, result in harm to Lender, impairment of the Note or this Instrument or any other security given under any other Loan Document;

(h)    any failure by Borrower to perform any of its obligations as and when required under any Loan Document other than this Instrument which continues beyond the applicable cure period, if any, specified in that Loan Document; and

(i)    any exercise by the holder of any other debt instrument secured by a mortgage, deed of trust or deed to secure debt on the Mortgaged Property of a right to declare all amounts due under that debt instrument immediately due and payable.

    **23.    REMEDIES CUMULATIVE.**  Each right and remedy provided in this Instrument is distinct from all other rights or remedies under this Instrument or any other Loan Document or afforded by applicable law, and each shall be cumulative and may be exercised concurrently, independently, or successively, in any order.

    **24.    FORBEARANCE.**

(a)    Lender may (but shall not be obligated to) agree with Borrower, from time to time, and without giving notice to, or obtaining the consent of, or having any effect upon the obligations of, any guarantor or other third party obligor, to take any of the following actions: extend the time for payment of all or any part of the Indebtedness; reduce the payments due under this Instrument, the Note, or any other Loan Document; release anyone liable for the payment of any amounts under this Instrument, the Note, or any other Loan Document; accept a renewal of the Note; modify the terms and time of payment of the Indebtedness; join in any extension or subordination agreement; release any Mortgaged Property; take or release other or additional security; modify the rate of interest or period of amortization of the Note or change the amount of the monthly installments payable under the Note; and otherwise modify this Instrument, the Note, or any other Loan Document.

(b)    Any forbearance by Lender in exercising any right or remedy under the Note, this Instrument, or any other Loan Document or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any other right or remedy.  The acceptance by Lender of payment of all or any part of the Indebtedness after the due date of such payment, or in an amount which is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other payments on account of the Indebtedness or to exercise any remedies for any failure to make prompt payment. Enforcement by Lender of any security for the

Indebtedness shall not constitute an election by Lender of remedies so as to preclude the exercise of any other right available to Lender. Lender's receipt of any awards or proceeds under Sections 19 and 20 shall not operate to cure or waive any Event of Default.

25. **LOAN CHARGES.** If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower is interpreted so that any charge provided for in any Loan Document, whether considered separately or together with other charges levied in connection with any other Loan Document, violates that law, and Borrower is entitled to the benefit of that law, that charge is hereby reduced to the extent necessary to eliminate that violation. The amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the principal of the Indebtedness. For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness which constitutes interest, as well as all other charges levied in connection with the Indebtedness which constitute interest, shall be deemed to be allocated and spread over the stated term of the Note. Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of the Note.

26. **WAIVER OF STATUTE OF LIMITATIONS.** Borrower hereby waives the right to assert any statute of limitations as a bar to the enforcement of the lien of this Instrument or to any action brought to enforce any Loan Document.

27. **WAIVER OF MARSHALLING.** Notwithstanding the existence of any other security interests in the Mortgaged Property held by Lender or by any other party, Lender shall have the right to determine the order in which any or all of the Mortgaged Property shall be subjected to the remedies provided in this Instrument, the Note, any other Loan Document or applicable law. Lender shall have the right to determine the order in which any or all portions of the Indebtedness are satisfied from the proceeds realized upon the exercise of such remedies. Borrower and any party who now or in the future acquires a security interest in the Mortgaged Property and who has actual or constructive notice of this Instrument waives any and all right to require the marshalling of assets or to require that any of the Mortgaged Property be sold in the inverse order of alienation or that any of the Mortgaged Property be sold in parcels or as an entirety in connection with the exercise of any of the remedies permitted by applicable law or provided in this Instrument.

28. **FURTHER ASSURANCES.** Borrower shall execute, acknowledge, and deliver, at its sole cost and expense, all further acts, deeds, conveyances, assignments, estoppel certificates, financing statements, transfers and assurances as Lender may require from time to time in order to better assure, grant, and convey to Lender the rights intended to be granted, now or in the future, to Lender under this Instrument and the Loan Documents.

29. **ESTOPPEL CERTIFICATE.** Within 10 days after a request from 'Lender, Borrower shall deliver to Lender a written statement, signed and acknowledged by Borrower, certifying to Lender or any person designated by Lender, as of the date of such statement, (i) that the Loan Documents are unmodified and in full force and effect (or, if there have been modifications, that the Loan Documents are in full force and effect as modified and setting forth such

modifications); (ii) the unpaid principal balance of the Note; (iii) the date to which interest under the Note has been paid; (iv) that Borrower is not in default in paying the Indebtedness or in performing or observing any of the covenants and agreements contained in this Instrument or any of the other Loan Documents (or, if the Borrower is in default, describing such default in reasonable detail); (v) whether or not there are then existing any setoffs or defenses known to Borrower against the enforcement of any right or remedy of Lender under the Loan Documents; and (vi) any additional facts requested by Lender.

### 30.   GOVERNING LAW; CONSENT TO JURISDICTION AND VENUE.

(a)   This Instrument, and any Loan Document which does not itself expressly identify the law that is to apply to it, shall be governed by the laws of the jurisdiction in which the Land is located (the **"Property Jurisdiction"**).

(b)   Borrower agrees that any controversy arising under or in relation to the Note, this Instrument, or any other Loan Document shall be litigated exclusively in the Property Jurisdiction. The state and federal courts and authorities with jurisdiction in the Property Jurisdiction shall have exclusive jurisdiction over all controversies which shall arise under or in relation to the Note, any security for the Indebtedness, or any other Loan Document.   Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

### 31.   NOTICE.

(a)   All notices, demands and other communications (**"notice"**) under or concerning this Instrument shall be in writing. Each notice shall be addressed to the intended recipient at its address set forth in this Instrument, and shall be deemed given on the earliest to occur of (1) the date when the notice is received by the addressee; (2) the first Business Day after the notice is delivered to a recognized overnight courier service, with arrangements made for payment of charges for next Business Day delivery; or (3) the third Business Day after the notice is deposited in the United States mail with postage prepaid, certified mail, return receipt requested. As used in this Section 31, the term "Business Day" means any day other than a Saturday, a Sunday or any other day on which Lender is not open for business.

(b)   Any party to this Instrument may change the address to which notices intended for it are to be directed by means of notice given to the other party in accordance with this Section 31. Each party agrees that it will not refuse or reject delivery of any notice given in accordance with this Section 31, that it will acknowledge, in writing, the receipt of any notice upon request by the other party and that any notice rejected or refused by it shall be deemed for purposes of this Section 31 to have been received by the rejecting party on the date so refused or rejected, as conclusively established by the records of the U.S. Postal Service or the courier service.

(c)   Any notice under the Note and any other Loan Document which does not specify how notices are to be given shall be given in accordance with this Section 31.

32.     **SALE OF NOTE; CHANGE IN SERVICER.** The Note or a partial interest in the Note (together with this Instrument and the other Loan Documents) may be sold one or more times without prior notice to Borrower. A sale may result in a change of the Loan Servicer. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given notice of the change.

33.     **SINGLE ASSET BORROWER.** Intentionally Omitted

34.     **SUCCESSORS AND ASSIGNS BOUND.** This Instrument shall bind, and the rights granted by this Instrument shall inure to, the respective successors and assigns of Lender and Borrower. However, a Transfer not permitted by Section 21 shall be an Event of Default.

35.     **JOINT AND SEVERAL LIABILITY.** If more than one person or entity signs this Instrument as Borrower, the obligations of such persons and entities shall be joint and several.

36.     **RELATIONSHIP OF PARTIES; NO THIRD PARTY BENEFICIARY.**

(a)     The relationship between Lender and Borrower shall be solely that of creditor and debtor, respectively, and nothing contained in this Instrument shall create any other relationship between Lender and Borrower.

(b)     No creditor of any party to this Instrument and no other person shall be a third party beneficiary of this Instrument or any other Loan Document. Without limiting the generality of the preceding sentence, (1) any arrangement (a **"Servicing Arrangement"**) between the Lender and any Loan Servicer for loss sharing or interim advancement of funds shall constitute a contractual obligation of such Loan Servicer that is independent of the obligation of Borrower for the payment of the Indebtedness, (2) Borrower shall not be a third party beneficiary of any Servicing Arrangement, and (3) no payment by the Loan Servicer under any Servicing Arrangement will reduce the amount of the Indebtedness.

37.     **SEVERABILITY; AMENDMENTS.** The invalidity or unenforceability of any provision of this Instrument shall not affect the validity or enforceability of any other provision, and all other provisions shall remain in full force and effect. This Instrument contains the entire agreement among the parties as to the rights granted and the obligations assumed in this Instrument. This Instrument may not be amended or modified except by a writing signed by the party against whom enforcement is sought.

38.     **CONSTRUCTION.** The captions and headings of the sections of this Instrument are for convenience only and shall be disregarded in construing this Instrument. Any reference in this Instrument to an "Exhibit" or a "Section" shall, unless otherwise explicitly provided, be construed as referring, respectively, to an Exhibit attached to this Instrument or to a Section of this Instrument. All Exhibits attached to or referred to in this Instrument are incorporated by reference into this Instrument. Any reference in this Instrument to a statute or regulation shall be construed as referring to that statute or regulation as amended from time to time. Use of the singular in this

Agreement includes the plural and use of the plural includes the singular. As used in this Instrument, the term "including" means "including, but not limited to."

39. **LOAN SERVICING.** All actions regarding the servicing of the loan evidenced by the Note, including the collection of payments, the giving and receipt of notice, inspections of the Property, inspections of books and records, and the granting of consents and approvals, may be taken by the Loan Servicer unless Borrower receives notice to the contrary. If Borrower receives conflicting notices regarding the identity of the Loan Servicer or any other subject, any such notice from Lender shall govern.

40. **DISCLOSURE OF INFORMATION.** Lender may furnish information regarding Borrower or the Mortgaged Property to third parties with an existing or prospective interest in the servicing, enforcement, evaluation, performance, purchase or securitization of the Indebtedness, including trustees, master servicers, special servicers, rating agencies, and organizations maintaining databases on the underwriting and performance of multifamily mortgage loans. Borrower irrevocably waives any and all rights it may have under applicable law to prohibit such disclosure, including any right of privacy.

41. **NO CHANGE IN FACTS OR CIRCUMSTANCES.** All information in the application for the loan submitted to Lender (the **"Loan Application"**) and in all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the Loan Application are complete and accurate in all material respects. There has been no material adverse change in any fact or circumstance that would make any such information incomplete or inaccurate.

42. **SUBROGATION.** If, and to the extent that, the proceeds of the loan evidenced by the Note are used to pay, satisfy or discharge any obligation of Borrower for the payment of money that is secured by a pre-existing mortgage, deed of trust or other lien encumbering the Mortgaged Property (a **"Prior Lien"**), such loan proceeds shall be deemed to have been advanced by Lender at Borrower's request, and Lender shall automatically, and without further action on its part, be subrogated to the rights, including lien priority, of the owner or holder of the obligation secured by the Prior Lien, whether or not the Prior Lien is released.

43. **ACCELERATION; REMEDIES.** At any time during the existence of an Event of Default, Lender, at Lender's option, may declare the Indebtedness to be immediately due and payable without further demand and may foreclose this Instrument by judicial proceedings and may invoke any other remedies permitted by Pennsylvania law or provided in this Instrument or in any other Loan Document. Lender shall be entitled to collect all costs and expenses incurred in pursuing such remedies, including but not limited to attorneys' fees and costs of documentary evidence, abstracts and title reports.

44. **RELEASE.** Upon payment of the Indebtedness, this Instrument shall become null and void and Lender shall discharge this Instrument. Borrower shall pay Lender's reasonable costs incurred in discharging this Instrument.

45.    **PURCHASE MONEY MORTGAGE.**  If the proceeds of the Indebtedness are used by Borrower to pay all or a part of the purchase price of the Mortgaged Property, this Instrument is declared to be a purchase money mortgage.

46.    **CONFESSION OF JUDGMENT FOR POSSESSION.**  During the existence of an Event of Default, Lender may enter into possession of the Mortgaged Property, with or without legal action, and by force if necessary; collect all Rent (which term shall also include sums payable for use and occupation) and, after deducting all costs of collection and administration expenses, apply the Rent in accordance with Section 9; and for that purpose Borrower hereby confirms the assignment to Lender of all Rent due and to become due under all Leases created after the date of this Instrument, as well as all rights and remedies provided in such lease or leases or at law or in equity for the collection of Rent.  The taking of possession and collection of Rent by Lender shall not be construed to be an affirmation of any Lease.  **FOR THE PURPOSE OF OBTAINING POSSESSION OF THE MORTGAGED PROPERTY DURING THE EXISTENCE OF AN EVENT OF DEFAULT, BORROWER AUTHORIZES AND EMPOWERS ANY ATTORNEY OF ANY COURT OF RECORD IN THE COMMONWEALTH OF PENNSYLVANIA OR ELSEWHERE, AS ATTORNEY FOR BORROWER AND ALL PERSONS CLAIMING UNDER OR THROUGH BORROWER, TO APPEAR FOR AND CONFESS JUDGMENT AGAINST BORROWER, AND AGAINST ALL PERSONS CLAIMING UNDER OR THROUGH BORROWER, IN AN ACTION IN EJECTMENT FOR POSSESSION OF THE MORTGAGED PROPERTY, IN FAVOR OF LENDER, FOR WHICH THIS INSTRUMENT, OR A COPY VERIFIED BY AFFIDAVIT, SHALL BE A SUFFICIENT WARRANT; AND THEREUPON A WRIT OF POSSESSION MAY IMMEDIATELY ISSUE FOR POSSESSION OF THE MORTGAGED PROPERTY, WITHOUT ANY PRIOR WRIT OR PROCEEDING WHATSOEVER AND WITHOUT ANY STAY OF EXECUTION.  IF FOR ANY REASON AFTER SUCH ACTION HAS BEEN COMMENCED IT SHALL BE DISCONTINUED, OR POSSESSION OF THE MORTGAGED PROPERTY SHALL REMAIN IN OR BE RESTORED TO BORROWER, LENDER SHALL HAVE THE RIGHT FOR THE SAME DEFAULT OR ANY SUBSEQUENT DEFAULT TO BRING ONE OR MORE FURTHER ACTIONS OF EJECTMENT TO RECOVER POSSESSION OF THE MORTGAGED PROPERTY. LENDER MAY CONFESS JUDGMENT IN AN ACTION IN EJECTMENT BEFORE OR AFTER THE INSTITUTION OF PROCEEDINGS TO FORECLOSE THIS INSTRUMENT OR TO ENFORCE THE NOTE, OR AFTER ENTRY OF JUDGMENT IN THE ACTION OF EJECTMENT OR ON THE NOTE, OR AFTER A SHERIFF'S SALE OR JUDICIAL SALE OR OTHER FORECLOSURE SALE OF THE MORTGAGED PROPERTY IN WHICH LENDER IS THE SUCCESSFUL BIDDER.  THIS AUTHORIZATION TO PURSUE SUCH PROCEEDINGS FOR CONFESSION OF JUDGMENT IS AN ESSENTIAL PART OF THE REMEDIES FOR ENFORCEMENT OF THIS INSTRUMENT AND THE NOTE, AND SHALL SURVIVE ANY EXECUTION SALE TO LENDER.**

47.    <u>**WAIVER OF TRIAL BY JURY.**</u>  **BORROWER AND LENDER EACH (A) COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS INSTRUMENT OR THE RELATIONSHIP BETWEEN THE PARTIES AS BORROWER AND LENDER THAT IS TRIABLE OF**

RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE.    THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.

**ATTACHED EXHIBITS.** The following Exhibits are attached to this Instrument:

Exhibit A          Description of the Land (required).

[X]    Exhibit B          Modifications to Instrument

**IN WITNESS WHEREOF**, Borrower has signed and delivered this Instrument under seal or has caused this Instrument to be signed and delivered by its duly authorized representative under seal. Borrower intends that this Instrument shall be deemed to be signed and delivered as a sealed instrument.

**BORROWER**

Harrisburg Hills Realty Associates, L.P.
By: Harrisburg Associates, LLC
General Partner

BY: _____
        Jeff Kurtz, Managing Member

State of New York          )
                                        : ss.:
County of New York       )

On the 20th day of February, 2002, before me, the undersigned, personally appeared Jeff Kurtz, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity(ies), and that by his/her signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

REGGIONI F. BRYAN
Notary Public, State of New York
No. 01BR6051846
Qualified in Kings County
Commission Expires 12/04/2002

# KEY PRINCIPAL

**Key Principal**          Not Applicable

© 1997-2001 Fannie Mae

## EXHIBIT A

## [DESCRIPTION OF THE LAND]

All those certain plots, pieces, or parcels of land with the buildings and improvements thereon erected, situate, lying, and being in the City of Harrisburg, Dauphin County, Pennsylvania, more particularly bounded and described according to a Survey by Robert G. Hartman, Jr., Registered Surveyor, dated August 1, 1986, revised August 15, 1986, as follows, to wit:

TRACT NO. 1:

BEGINNING at a point being the southeast corner of Shamokin Street (60 feet wide) and Green Street (120 feet wide);

THENCE along the South side of Shamokin Street North 87 degrees 26 minutes 30 seconds East 147 feet to a point being the southwest corner of Shamokin Street and Susquehanna Street (25.5 feet wide);

THENCE extending along the West side of Susquehanna Street South 02 degrees 33 minutes 30 seconds East 565 feet to a point at the northwest corner of Susquehanna Street and Wiconisco Street (60 feet wide);

THENCE extending along the North side of Wiconisco Street South 87 degrees 26 minutes 30 seconds West 147 feet to a point at the northeast corner of Wiconisco Street and Green Street;

THENCE extending along the East side of Green Street North 02 degrees 33 minutes 30 seconds West 565 feet to a point, the place of BEGINNING.

TRACT NO. 2:

BEGINNING at a point being the southwest corner (erroneously stated as southeast corner in prior deeds) of Shamokin Street (60 feet wide) and Green Street (120 feet wide);

THENCE along the West side of Green Street South 02 degrees 33 minutes 30 seconds East 565 feet to a point at the northwest corner of Green Street and Wiconisco Street (60 feet wide);

THENCE extending along the North side of Wiconisco Street South 87 degrees 26 minutes 30 seconds West 147 feet to a point at the northeast corner of Wiconisco Street and Penn Street (25.5 feet wide);

THENCE extending along the East side of Penn Street North 02 degrees 33 minutes 30 seconds West 565 feet to a point at the southeast corner of Penn Street and Shamokin Street;

THENCE extending along the South side of Shamokin Street North 87 degrees 26 minutes 30 seconds East 147 feet to a point, the place of BEGINNING.

TRACT NO. 3:

BEGINNING at a point, the Northwest corner of Carey Street (50 feet wide) and an unnamed twenty (20) feet wide alley;

THENCE extending from said beginning point along the Northern side of said alley North 81 degrees 51 minutes 37 seconds West 270.00 feet to a point, the Northeast corner of said alley and Thomas Street (50 feet wide);

THENCE extending along the Eastern side of Thomas Street, North 08 degrees 08 minutes 23 seconds East 465.62 feet to a point on the South side of Parkway Boulevard (135 feet wide);

THENCE extending along said Parkway Boulevard on an arc of a circle curving to the right having a radius of 300.64 feet, an arc length of 58.46 feet along the South side of said Parkway Boulevard;

THENCE South 40 degrees 25 minutes 37 seconds East 297.03 feet to a point on the West side of Carey Street;

THENCE extending along the said side of Carey Street South 08 degrees 08 minutes 23 seconds West 234.86 feet to a point, the place of BEGINNING.


TRACT NO. 4:

BEGINNING at a point, being the Southwest corner of Parkway Boulevard (135 feet wide) and Thomas Street (50 feet wide);

THENCE extending along the Westerly side of Thomas Street South 08 degrees 08 minutes 23 seconds West 501.96 feet to a point;

THENCE extending along lands now or formerly of J.W. Kline and the City of Harrisburg the following three courses and distances: (1) North 81 degrees 51 minutes 37 seconds West 80.00 feet, (2) North 08 degrees 08 minutes 23 seconds East 80.00 feet and (3) North 81 degrees 51 minutes 37 seconds West 221.91 feet to a point;

THENCE continuing along lands now or late of the City of Harrisburg the following two courses and distances: (1) North 48 degrees 08 minutes 24 seconds East 158.06 feet and (2) North 04 degrees 38 minutes 37 seconds West 385.00 feet to a point on the Southerly side of Parkway Boulevard;

THENCE extending along said Parkway Boulevard the following two courses and distances: (1) South 67 degrees 28 minutes 37 seconds East 266.90 feet and (2) on the arc of a circle curving to the right having a radius of 300.64 feet the arc length of 28.21 feet to the point and place of BEGINNING.

TRACT NO. 5:

BEGINNING at a point, being the southeast corner of Wiconisco (60 feet wide) and Green Street (120 feet wide);

THENCE along the South side of Wiconisco Street, North 87 degrees 26 minutes 30 seconds East 147 feet to a point at the southwest corner of Wiconisco Street and Susquehanna Street (25.5 feet wide);

THENCE extending along the West side of Susquehanna Street South 02 degrees 33 minutes 30 seconds East 565 feet to a point, the northwest corner of Susquehanna Street and Radnor Street (60 feet wide);

THENCE extending along the North side of Radnor Street, South 87 degrees 26 minutes 30 seconds West 147 feet to a point, the northeast corner of Radnor Street and Green Street;

THENCE extending along the East side of Green Street, North 02 degrees 33 minutes 30 seconds West 565 feet to a point, the place of BEGINNING.


TRACT NO. 6:

BEGINNING at a point being the southwest corner of Wiconisco Street (60 feet wide) and Green Street (120 feet wide);

THENCE extending along the West side of Green Street South 02 degrees 33 minutes 30 seconds East 565 feet to a point at the northwest corner of Radnor Street (60 feet wide) and Green Street (120 feet wide);

THENCE extending along the North side of Radnor Street South 87 degrees 26 minutes 30 seconds West 147 feet to a point being the northeast corner of Radnor Street and Penn Street (25.5 feet wide);

THENCE extending along the East side of Penn Street North 02 degrees 33 minutes 30 seconds West 565 feet to a point being the southeast corner of Wiconisco Street and Penn Street;

THENCE extending along the South side of Wiconisco Street North 87 degrees 26 minutes 30 seconds East 147 feet to a point, the place of BEGINNING.


TRACT NO. 7:

BEGINNING at a point being the southeast corner of Radnor Street (60 feet wide) and Green Street (120 feet wide);

THENCE along the South side of Radnor Street North 87 degrees 26 minutes 30 seconds East 147 feet to a point at the southwest corner of Radnor Street and Susquehanna Street (25.5 feet wide);

THENCE extending along the West side of Susquehanna Street South 02 degrees 33 minutes 30 seconds East 565 feet to a point at the northwest corner of Susquehanna Street and Schuylkill Street (60 feet wide);

THENCE extending along the North side of Schuylkill Street South 87 degrees 26 minutes 30 seconds West 147 feet to a point at the northeast corner of Schuylkill Street and Green Street;

THENCE extending along the East side of Green Street North 02 degrees 33 minutes 30 seconds West 565 feet to a point, the place of BEGINNING.

TRACT NO. 8:

BEGINNING at a point being the southwest corner of Radnor Street (60 feet wide) and Green Street (120 feet wide);

THENCE along the West side of Green Street South 02 degrees 33 minutes 30 seconds East 565 feet to a point at the northwest corner of Green Street and Schuylkill Street (60 feet wide);

THENCE extending along the North side of Schuylkill Street South 87 degrees 26 minutes 30 seconds West 147 feet to a point at the northeast corner of Schuylkill Street and Penn Street (25.5 feet wide);

THENCE extending along the East side of Penn Street North 02 degrees 33 minutes 30 seconds West 565 feet to a point at the southeast corner of Penn Street and Radnor Street;

THENCE extending along the south side of Radnor Street North 87 degrees 26 minutes 30 seconds East 147 feet to a point, the place of BEGINNING.

BEING THE SAME PREMISES which Nele Apartments, LLC, conveyed unto Harrisburg Hills Realty Associates, L.P., by deed dated February 9, 2000 and recorded February 14, 2000 in the Recorder's Office in and for Dauphin County, PA., in Record Book 3610 at Page 381.

TOGETHER with all right, title and interest of the mortgagor in and to the land lying in the streets and roads in front of and adjoining said premises to the center line thereof.

SAID PREMISES being known as and by the street number 2632A Green Street, Harrisburg, Pennsylvania.

## EXHIBIT B

## MODIFICATIONS TO INSTRUMENT

1.      In the event of a sale, conveyance or transfer of ownership of the Mortgaged Property by the Borrower or any subsequent owner thereof, this mortgage will immediately become due and payable at the option of the  Lender.  As used in this paragraph, the phrase "sale, conveyance or transfer of ownership" shall be construed to include, but not be limited to, with respect to the Mortgaged Property: a) an installment sales contract; b) a lease with an option to buy; c) a lease for more than three (3) years including renewal terms; d) a transfer of stock of the Borrower, if Borrower is a corporation; e) any change in the general partners comprising Borrower, as same presently exist,including any transfer of stock in any corporate general partner, if Borrower is a partnership; f) any change in the members comprising the Borrower, if the Borrower is a limited liability company including any change in the members in any limited liability company which is a general partner if the Borrower is a partnership; and g) the creation of any other lien or encumbrance involving a transfer of rights of occupancy.

Notwithstanding the above, Lender hereby agrees that the following transfers shall not be considered a "sale, transfer or conveyance of ownership of the Mortgaged Property":

a.      Transfers of membership interests of the limited liability company general partner between Richard Kurtz and Jeff Kurtz (the "Members");

b.      Transfers of membership interests of the limited liability company general partner from any Member to his/her respective spouse and/or non minor child or children;

c.      Borrower's transfer of the Property to a partnership, a corporation, a limited liability company, or to any other entity, provided the parties recited in or permitted under subsections (a) and/or (b) above continue(s) to hold a 100% equity interest in said entity;

d.      A transfer to which Lender has consented;

e.      A transfer that occurs by devise, descent, or by operation of law upon the death of a natural person or a transfer of membership interests of the limited liability company general partner by the Members to a trust, the beneficiary or beneficiaries of which are such Member's immediate family members (spouse and/or child or children), established for estate planning purposes; and

f.      A transfer of obsolete or worn out personalty or fixtures that are contemporaneously replaced by items of equal or better function and quality, which are free of liens, encumbrances and security interests other than those created hereby or consented to by Lender.

Provided, however, that none of the above transfers shall be or be deemed to be or operate in any way as a full or partial release of the Borrower from any of the liabilities or indemnities set forth in this mortgage.

2.     The Borrower hereby covenants and acknowledges that it has opened a non interest bearing checking account with the Lender to serve as the operating account (the "Operating Account"), for the Mortgaged Property.  The Borrower further covenants and agrees that this Operating Account is and shall be the sole operating account maintained in connection with the operation of the Mortgaged Property, that all income, expenses, and other cash-flow generated by the Mortgaged Property shall be deposited into or paid through this Operating Account and Borrower shall maintain the Operating Account or guarantee the maintenance of the Operating Account until all amounts secured hereunder are repaid in full with interest.

3.     Lender hereby agrees that it will not unreasonably withhold its consent to a one-time transfer of the Mortgaged Property from the Borrower to a bona fide third party purchaser of the Mortgaged Property (the "Purchaser"), provided, however, that (a) there shall be no event of default hereunder the time within which to cure has expired; (b) the Purchaser shall, prior to any such transfer, complete the Lender's usual form of mortgage application and deliver same to the Lender, together with Purchaser's personal financial statements, and such other documentary verifications as may be reasonably required by the Lender and provided further that, based upon such application and documentary evidence, which must be true and correct in all respects, the credit history and financial information of the Purchaser is found acceptable to the Lender by application of its usual underwriting standards and further that the Purchaser is found to have a net worth no less than the Borrower at the time of Borrower's application; (c) at the time of such transfer, the Purchaser enters into a Modification and Assumption Agreement with the Lender, the form and content of which shall be subject to Lender's sole approval; and (d) prior to any such transfer, the Borrower pays to the Lender a non-refundable transfer fee equal to one (1%) percent of the unpaid principal balance at the time of such transfer. The right to transfer granted under the terms of this paragraph can be exercised only once and only by the original Borrower and no such right to transfer is granted or deemed to be granted to any Purchaser.   Borrower agrees to pay all costs in connection with such transfer including, but not limited to, the fees of Lender's attorney.

**FANNIE MAE MULTIFAMILY SECURITY INSTRUMENT -**
**PENNSYLVANIA**

**Form 4039**     **11/01**    *Page B-6*

© 1997-2001 Fannie Mae

SCHEDULE B

MODIFICATIONS TO MULTIFAMILY NOTE

# NONE